**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**CASE NO. 9:22-cr-80084-RLR**

UNITED STATES OF AMERICA
       Plaintiff,
v.
MATTHEW COMISKEY,
       Defendant.
_____/

**MOTION FOR DOWNWARD VARIANCE AND SENTENCING MEMORANDUM**

Mr. Comiskey is to be sentenced following his plea of guilty to one count of interstate threats in violation of 18 U.S.C. 875 (c). We respectfully request, the Court sentence Mr. Comiskey to a sentence of house arrest and one month prison, which reflects a reasonable downward variance from the low end of his advisory sentencing guideline range. In the PSR, The U.S. Probation Office finds that Mr. Comiskey's sentencing range is 24 to 30 months (see paragraph 56 PSR). We respectfully submit that a sentence below Mr. Comiskey's advisory sentencing range would be sufficient but not greater than necessary to accomplish all the purposes of sentencing in light of Mr. Comiskey's personal history and characteristics, including the fact that Mr. Comiskey has no criminal background, has been a model citizen up until now and is a low risk for engaging any violence (see attached Exhibit A).

**PERSONAL BACKGROUND**

Mr. Comiskey's personal and family data is set forth on pages 7 through 8 of the PSR (see paragraphs 32-36) Suffice it to say that Mr. Comiskey's background was not in any way predicative of his conduct in this case

**THE OFFENSE**

Mr. Comiskey pled guilty to one count of making an interstate threat. The facts surrounding this misconduct are set forth in paragraphs 6 through 11 of the PSR.

## THE PRE-SENTENCE REPORT (PSR)

The US Probation Office found that Mr. Comiskey's Guidelines imprisonment range was 24 to 30 months, based upon a total offense level of 17 and a criminal History Category of I (see paragraph 56 PSR). For reasons that will be explained at sentencing, this guidelines range is overstated.

## LETTERS

Attached here as composite Exhibit B are letter(s) received from Mr. Comiskey's family members, which we ask the Court to review in order to gain a more complete understanding of Mr. Comiskey's history and characteristics.

## SENTENCING UNDER SECTION 3553

The Court is required to impose a sentence that is "sufficient but not greater than necessary" to achieve, the purposes of sentencing set forth in Title 18, USC§ 3553 (a) (2). Thus, a Sentencing Court is to impose the shortest sentence that achieves the purposes of sentencing.

In determining a sentence, the Court shall consider the factors set forth in section 3553 (a) including:

1. The nature and circumstances of the offense and the history and characteristics of the defendant.
2. The need for the sentence imposed:
   a. To reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense.
   b. To afford adequate deterrence to criminal conduct.
   c. To protect the public from further crimes of the defendant and

> d. To provide the defendant with needed educational and vocational training, medical care, or other correctional treatment in the most effective manner.

We respectfully submit that a sentence of house arrest would be sufficient to accomplish all of these above factors, based upon Mr. Comiskey's personal history and characteristics, including the facts of this case.

## THE NATURE OF THE CIRCUMSTANCES

We do not mean to minimize the seriousness of the offense to which Mr. Comiskey pled guilty. But in view of Mr. Comiskey's background we believe a downward variance which would be appropriate.

## THE HISTORY AND CHARACTERISTICS OF DEFENDANT

Mr. Comiskey's offense characteristics are set forth in paragraphs 32 through 36 of the PSR.

The Court should note that the defendant's criminal history Category is I.

## THE NEED FOR THE SENTENCE IMPOSED TO REFLECT THE SERIOUSNESS OF THE OFFENSE, TO PROMOTE RESPECT FOR THE LAW, TO PROVIDE JUST PUNISHMENT FOR THE OFFENSE, TO AFFORD ADAOUATE DEFERENCE TO CRIMINAL CONDUCT AND TO PROTECT THE PUBLIC FROM FURTHER CRIMES OF THE DEFENDANT

A sentence of one month imprisonment followed by house arrest would be sufficient. Clearly, there must be some form of punishment imposed by the Court, but given the factors set forth above, as well as the defendant's characteristics a sentence of one month incarceration followed by house arrest as a condition of supervised release would be appropriate.

## **CONCLUSION**

For the foregoing reasons we respectfully submit that a downward variance, as requested would result in a sentence that is "sufficient but not greater than necessary" to accomplish the statutory purpose of sentencing.

Dated: March 21, 2023.

                                          Respectfully submitted,

                                          **Michael B. Cohen**
                                          Michael B. Cohen, Esq.
                                          Florida Bar No: 210196
                                          6400 North Andrews Ave., Ste 505
                                          Fort Lauderdale, Florida 33309
                                          Ph (954) 928-0059
                                          Email: micheal@mcohenlaw.com
                                          Email: eservice@mcohenlaw.com

# EXHIBIT A



Office: (954) 766-8826  
Fax: (954) 764-3486

**11760 W. Sample Road, #103**
**Coral Springs, Florida 33065**

**Confidential Forensic Psychological Evaluation**
**(Risk Assessment)**

| | |
|---|---|
| **Examinee's Name:** | Matthew Comiskey |
| **Case #:** | 22-80084-CR-Rosenberg/Reinhart |
| **Judge:** | Robin L. Rosenberg |
| **Defense Attorney:** | Michael B. Cohen, Esquire |
| **Date of Evaluation:** | 11-05-22 |
| **Date of Report:** | 11-15-22 |
| **Examiner:** | Michael P. Brannon, Psy.D. |

**Reason for Referral:** Mr. Matthew Comiskey was evaluated at the request of his attorney, Mr. Michael Cohen, for an assessment of his future risk potential with risk reduction strategies if clinically indicated. He was evaluated on the above date via the Zoom platform. He is charged with five counts of Interstate Commerce Threats. He is scheduled for his next court appearance on this matter on 01-19-23.

**Sources of Information:**

    Clinical Interview
    Mental Status Examination
    HCR-20(V3)
    Inventory of Offender Risks, Needs, and Strengths (IORNS)
    Minnesota Multiphasic Personality Inventory – Third Edition (MMPI-3)
    Anger Disorders Scale (ADS)
    Psychopathic Personality Inventory–Revised (PPI-R)
    Beck Depression Inventory – Second Edition (BDI-II)
    Beck Anxiety Inventory (BAI)
    Beck Hopelessness Scale (BHS)
    Substance Abuse Subtle Screening Inventory – Fourth Edition (SASSI-4)
    Reliable Digit Span
    Indictment
    Telephone Interview with Ms. Anita Comiskey (examinee's mother)

**Confidentiality/Informed Consent:** The examinee was informed of the purpose of the current evaluation and the limits of its confidentiality and he agreed to participate in the assessment. He was encouraged to be honest in his responses to examiner inquiries and when completing psychological testing.

**Relevant Historical Information:** Mr. Comiskey reported that he is 38 years of age and that he was born in New York on 04-14-84. He stated that he was raised by his mother and father with one younger sister. He did not report any incidents of abuse, neglect, or domestic violence during his formative years. He did not report exposure to any traumatic events during his childhood or adolescence. He described his childhood as "overall happy." He was not aware of any family history of mental illness or drug/alcohol abuse.

Academically, the examinee reported that he completed high school and two years of college, earning an Associate's degree in Business Management. He stated that he earned above-average to average grades in mainstream classes in high school. He related that he was never retained in a grade level. He did not report any major behavioral problems in school. He reported that he was never involved in a physical altercation with a student or faculty member while in school. He did not report any problems in school due to inattentiveness and hyperactivity. He stated that he was excessively teased by other students while in elementary school.

The examinee reported that he has never been married. He stated that his longest romantic relationship lasted for four years. He related that he has never cohabitated with another person in a relationship. He did not report any incidents of domestic violence in his relationships. He related that he does not have any children. He stated that he was residing alone in Plantation, Florida at the time of this assessment. He indicated that he has never been homeless.

Occupationally, the examinee reported that he was employed at a health food store at the time of this assessment. He related that his longest employment lasted for four years. He stated that he was fired from one job. He reported that he has never been involved in a physical altercation with another employee or supervisor at a job. He stated that he has never received Social Security disability benefits. He reported that he has received unemployment benefits on two occasions. He related that he has never served in the United States military.

Legally, the examinee reported that he was never arrested before his current charges. He stated that he has never been a member of a delinquent youth gang, cult, or militia group.

Socially, he reported that he has several friends in New York. He related that none of his friends have been arrested. He reported that none of his friends have abused drugs or alcohol. Recreationally, he stated that he enjoys metal detecting, hiking, and camping.

Regarding his mental health history, the examinee reported that he participated in three sessions of counseling after the termination of a romantic relationship in "2003 or 2004." He stated that he has never received any other form of psychiatric or psychological treatment services. He reported that he has never attempted suicide or entertained ideations of self-harm. He did not report severe mood fluctuations. He did not report symptoms of depression. He related that he has experienced several symptoms of anxiety beginning when he was in college. He stated that he has never suffered a panic attack. He did not report auditory or visual hallucinations. He did not report delusional beliefs. He revealed a history of anger control problems. He did not report any symptoms of posttraumatic stress.

The examinee acknowledged the use of marijuana and alcohol. He related that he has never abused prescription medication. He stated that he initially used marijuana when he was 15 years of age and alcohol when he was 17 years of age. He reported the daily use of marijuana and the use of alcohol "two or three times per week" at the time of his arrest. He stated that his last use of marijuana and alcohol was on the date of his arrest (06-03-22). He reported that he has used alcohol and marijuana when he was alone and while he was in the company of his peers. He stated that he has never used alcohol or marijuana to reduce emotional distress. He reported that he has never

experienced a blackout due to his use of alcohol. He identified his mother as his primary source of emotional support in the community. He related that he has never participated in drug or alcohol rehabilitation treatment and that he has never attended a recovery group meeting. He stated that he has never engaged in excessive gambling activities.

Medical health was reported as unremarkable as he did not reveal any major injuries or illnesses including the occurrence of a head injury.

**Mental Status Examination:** The examinee was appropriately groomed and attired in casual clothing. He reported his height as 5'8" and his weight as 150 pounds. He displayed a trimmed beard and mustache. He was able to state his name, date, and location. His general clinical presentation was cooperative and his demeanor was serious. Motor responses were within normal limits with no apparent impairments. Eye contact was direct. Responses to examiner inquiries were appropriate in volume, pacing, and word production. Memory functions were intact on brief measures of those cognitive skills. His attention span was within normal limits as he was not easily distracted by extraneous stimuli. He did not appear to be attending to imaginary internal stimuli at any time. He did not verbalize any statements that would suggest the presence of an active delusional belief system. Functional intelligence was grossly estimated in the Average range based on his use of vocabulary and general fund of knowledge. He expressed his emotions in a restricted range and his mood was congruent with the content of the assessment. Judgment, problem-solving skills, and insight were good. He was not suggestible at any time during the assessment. He did not report suicidal or homicidal ideations or plans.

**Collateral Interview**: In a telephone interview with the examinee's mother, Ms. Anita Comiskey, she reported that her son did not experience any issues during his infancy. She reported that he was never exposed to any form of physical or sexual abuse during his childhood or adolescence. She related that there was a family history of drug/alcohol abuse (grandfather). She reported that her son did "okay" in school. She reported that the examinee completed high school and received an Associate's degree in Fine Arts. She was aware that her son had been involved in two serious romantic relationships. She related that her son has never been arrested. She reported that her son has never received any form of counseling or been prescribed psychotropic medications. She stated that her son does not have a bad temper and that she has never observed him engage in aggressive behaviors toward others. She related that he has never displayed issues complying with established rules and regulations. She was not aware of any drug or alcohol abuse by her son. She related that her son does not own any weapons or have any fascination with them. She reported that he is not a part of any extremist or political activist groups. She was aware of the current charges against her son and she indicated she was "shocked" by those allegations. She was not aware of any complaints made against her son regarding violent behavior or threats. She stated that she would remain supportive of her son throughout his current legal situation.

**Psychological Testing:** The Minnesota Multiphasic Personality Inventory – Third Edition (MMPI-3) is a frequently administered personality test in clinical and forensic settings. It has several Validity scales designed to assess for response distortion and numerous Clinical scales designed to assess for symptoms of a mental health disorder. Validity scales did not reveal any significant elevations. As a result, Clinical scales were determined to be valid and interpretable. Clinical scales did not reveal any significant elevations. In other words, the examinee's MMPI-3

was within normal limits in all areas assessed by this test measure.

The Psychopathic Personality Inventory-Revised (PPI-R) is a self-report measure designed to assess for the presence of traits associated with psychopathic personality. Individuals scoring high on this test tend to be callous, self-centered, and manipulative in their relations with others. In addition, they tend to display higher rates of aggression and deficits in their ability to empathize with others. The PPI-R includes Validity Scales and Content Scales. Validity scales did not indicate that the examinee was attempting to present in an overly positive light or endorse bizarre items in an attempt to fabricate symptoms. Results from Content Scales and the PPI-R Total Score indicate that the examinee does not show personality traits associated with a psychopathic personality.

The Anger Disorders Scale (ADS) is a self-report measure frequently administered to assess for various aspects of problematic anger. The ADS was determined to be a valid profile as there was no evidence of defensive responding. Clinical scales revealed significant elevations on Resentment and Impulsivity. Individuals who obtain the same scale elevations as the examinee often tend to harbor angry feelings over past perceived transgressions by others. Additionally, they are likely to engage in behaviors at times without considering the possible consequences of those actions. Individuals who obtain the same scores as the examinee on the ADS are rarely diagnosed with severe anger problems.

The Beck Depression Inventory – Second Edition (BDI-II) is one of the most commonly used brief assessment scales for symptoms of depression. The examinee obtained a total score on the BDI-II which falls in the Low range of depressive symptomatology. Individuals who score in the above range are reporting few symptoms of depression during the two weeks before and including the test date.

The Beck Anxiety Inventory (BAI) is one of the most commonly administered screening tools for anxiety. The examinee obtained a Total Score on the BAI that falls in the Moderate range for anxiety. Individuals who score in the above range are reporting several symptoms of anxiety during the 30 days before and including the test date.

The Beck Hopelessness Scales (BHS) is a frequently administered test designed to assess feelings of hopelessness. The examinee scored in the Low range on the BHS. Individuals who obtain the same score as the examinee are reporting few symptoms of Hopelessness during the seven days before the date of the test administration.

The Substance Abuse Subtle Screening Inventory – Fourth Edition (SASSI-4) is a substance abuse assessment tool that was designed to provide information regarding the possible presence and severity of drug and/or alcohol problems. It provides Validity Scales to assess random and defensive responding. It also contains numerous scales designed to assess the possible presence of drug and alcohol problems. Validity Scales did not reveal any indications of response distortion as discussed above. Test results did not reveal any significant elevations on test scales designed to assess for drug or alcohol abuse problems.

Reliable Digit Span is an effort test requiring the examinee to repeat several digits forward and backward. Individuals who score below the cut-off score are often suspected of poor effort on cognitive tasks. The examinee scored above the established cut-off score on this test. As a result, the examinee's score was consistent with adequate effort on cognitive tasks.

**Critical Incident:** The Indictment revealed that the examinee was charged with several counts of Interstate Threat for knowingly transmitting in interstate commerce a "communication containing any threat to injure the person of another..." It was reported that the examinee posted a series of threatening transcriptions on the Twitter application targeted toward U.S. Congresswoman Lauren Boebert between August and September 2021. Upon conviction, the examinee was required to forfeit all personnel that was traceable to the offense.

**Examinee's Report Regarding Critical Incident:** The examinee was asked numerous questions regarding his actions on the date of the alleged offenses to assess his future risk potential. The examinee's responses to the examiner's questions in this section were not included in the report due to the predisposition status of his current legal case.

**Risk Assessment:** The Inventory of Offender Risk, Needs, and Strengths (IORNS) is a risk assessment tool that combines an analysis of static variables, dynamic variables, and protective factors as they relate to risk potential, treatment needs, and recidivism. The IORNS contains Validity Scales designed to assess for Favorable Impression Management and Inconsistent Response Style. Additionally, the IORNS contains Clinical Scales designed to assess for various factors that are associated with potential risk (including risk reduction factors). On the current testing, Validity Scales revealed a significant elevation on test scales designed to assess for defensive responding to test items. As a result, the Index Scales, Dynamic Need Scales, and Protective Strength Scales may underestimate any genuine problem areas. Index Scales revealed the following scores: Overall Risk Index – 43rd percentile, Dynamic Need Index – 12th percentile, Static Risk Index – 14th percentile, and Protective Strength Index – 11th percentile. Individuals who obtain the same scores as the examinee are often determined to fall in the Low Risk Category for recidivism.

The HCR-20(V3) is one of the most frequently utilized instruments in the assessment of risk potential. The HCR-20(V3) contains 10 Historical Items, 5 Clinical Items, and 5 Risk Management Items. Each of the 20 risk factors is classified as present, partially present, or not present. In addition, each of the 20 risk factors is rated regarding its relevance (high, moderate, low) to the examinee's historical, recent, and/or anticipated future violence. Finally, the examinee is classified as low, moderate, or high as to their risk potential in the following areas: risk for future violence, serious physical harm, and risk for imminent violence. In the current case, an analysis of the HCR-20(V3) factors revealed the following:

### Historical

1. **History of Problems with Violence** – *Not Present*
2. **History of Problems with Other Antisocial Behaviors** – *Not Present*
3. **History of Problems with Relationships** – *Not Present*
4. **History of Problems with Employment** – *Not Present*
5. **History of Problems with Substance Abuse** – *Present/Moderate Relevance* – examinee reported the daily use of marijuana at the time of his arrest.
6. **History of Problems with Major Mental Disorder** – *Not Present*
7. **History of Problems with Personality Disorder** – *Not Present*
8. **History of Problems with Traumatic Experiences** – *Not Present*
9. **History of Problems with Violent Attitudes** – *Not Present*
10. **History of Problems with Treatment/Supervision** – *Not Present*

### Clinical

11. **Recent problems with Insight** – *Not Present*
12. **Recent problems with Violent Ideation or Intent** – *Not Present*
13. **Recent problems with Symptoms of Major Mental Disorder** – *Not Present*
14. **Recent problems with Instability** – *Not Present*
15. **Recent problems with Treatment/Supervision** – *Not Present*

### Risk Management

16. **Future Problems with Professional Services and Plans** – *Not Present*
17. **Future Problems with Living Situation** – *Not Present*
18. **Future Problems with Personal Support** – *Not Present*
19. **Future Problems with Treatment/Supervision** – *Not Present*
20. **Future Problems with Stress or Coping** – *Not Present*

**Additional Risk Factor Analysis:** The examinee indicated that he has never owned weapons, including firearms, knives, or explosives. He stated that he and his family have strong political opinions, although he stated that they do not belong to any group or organization (other than a registered political party) with similar ideologies. He stated that he has never attended a political function or contributed to a political candidate or cause. He reported that he has never attended a protest march or a meeting of a political interest group. He related that he does not engage in social media discussions regarding his political views. He reported that he does not fear aggressive actions towards himself or his family by individuals with different political beliefs. He related that he does not believe that he is being followed or monitored by others. He reported that other than the current allegations, he has never engaged or threatened to engage in aggressive actions toward others with differing political views. He stated that he has restricted his viewing time of the news as a method of not becoming over-focused on high-conflict political issues in the country.

**Conclusions:** It should be noted that mental health professionals are not able to predict the occurrence of a future event such as violence. However, there are empirically-based factors that can effectively place individuals into specific risk categories. Based on information obtained from the HCR-20(V2) and IORNS, it is the opinion of this examiner that the examinee falls in the *Low Risk* range for engaging in future violence; the *Low Risk* range for engaging in serious physical harm; and the *Low Risk* range for engaging in imminent violence. Psychological testing and a telephone interview with the examinee's mother did not reveal any indications of mental illness or antisocial/psychopathic personality traits. The examinee's actions on the dates of the alleged offenses were likely impulsive reactions during a stressful period (Covid-19 pandemic) in a family environment espousing strong political beliefs (according to the examinee's mother). If the current allegations against the examinee are accurate as alleged, he would be an appropriate candidate for participation in weekly individual counseling sessions. Treatment should ideally reflect on his actions at the time of the offenses, reduce impulsivity, address his daily use of marijuana, become aware of the impact of his actions on himself and others, and learn prophylactic strategies to avoid similar conduct in the future. The examinee's prognosis for a successful treatment outcome was determined to be good due to adequate family support, no antisocial/psychopathic personality traits, and no history of criminal activities.

Thank you for the opportunity to participate in this interesting case and please feel free to telephone me if you require further information on this matter.

**Michael P. Brannon, Psy.D.**
Licensed Psychologist
PY4289

# EXHIBIT B

Dear Judge Roseberg:

      My name is Fatima Pulizzi and I reside at 330 Normandy Lane, Delray Beach, Fl., 33483 and my cell phone number is 347-233-1945.

      I am writing to on behalf of Matthew Comiskey and the Internet twitter threat made to US Representative Lauren Boebert.  While Matthew has taken responsibilty for his lapse in judgement, I find his behavior  to be totally out of character for the Matthew that I have come to know.

      Matthew has always shown great maturity and common sense.  I observed him dicussing life plains with my son, who is few years younger that Matthew.  Giving him positive advice and suggesting roads to take for a better future.  My son recently relocated to North Carolina and Matthew offered advice about acclimating to a new home and City and I will always be thankful to him for that.  We have know Matthew and his parents for almost 4 years and consider them family.

      Matthew's life is forever changed by this rare lapse in judgement.  He has lost his career in Insurance and his Agent License.  This lose will affect him for the rest of his life.  Please look at the whole man and not just his one poor lapse in judgement when making your life altering decision.

      I thank you for you consideration.

                                    Sincerely

November 7, 2022

Dear Honorable Judge Rosenberg,

    My name is Bridget Sullivan of 6710 36th Avenue East, Lot 126, Palmetto FL, 34221. My phone number is 516-993-1851 and my email is b.sullivan41@outlook.com.

    I am writing on behalf of Matthew Comiskey, whom I have personally known for 20 years as a close friend and confidant. In this time, he has consistently proven himself to be a dedicated and loyal individual both in his personal as well as professional life. Throughout the years, he has continuously formed a strong positive outlook on life and exhibited great interpersonal skills with creative and success-oriented approaches to anything he does.

    Matthew confessed to me the serious lack of judgement he exhibited when he created threats toward Representative Boebert on Twitter. He has expressed time and time again both strong remorse as well as an even stronger desire to improve his life moving forward.

    If you should have any further queries with regard to Matthew, please feel free to contact me via telephone or email.

Sincerely,

Bridget Sullivan

10/29/2022

Dear Judge Rosenberg,

My name is Anita Comiskey, mother of Matthew Comiskey, charged with an interstate online threat made on Twitter to US Representative Lauren Boebert.  My heart was broken after reading the charges as well as my shock at finding this was true.  I have never seen this behavior in my son and would like to try to explain the circumstances leading up to this unfortunate situation.

Matt moved to Florida to be closer to us as we age.  He had a job lined up and a roommate as well.  By the time he came down, the job was non-existent as covid forced the insurance agency to have all current employees work remote & no new hires as there was no training available.  So, Matt was stuck living in my office, sitting all day on the couch, watching the news, which was more and more frustrating as the country was divided, the outbreak of an unknown disease kept us all home 24/7 in a tiny condo.  Not the healthiest situation for a single young man. Matt had to apply for unemployment, had no job prospects and frustration grew.  This is the background leading up to that awful threat.  Shortly after, Matt took online courses at night and weekends (When my home office was available) to get his Florida insurance agent's license.  He interviewed remotely and then was hired.  Life became more tolerable as he worked full time and started to see hope.  He had saved enough to buy a small condo and became a homeowner...quite an achievement!  Matt is an avid metal detector, looking for historical coins and objects, he loves the outdoors.  As a boy scout and Eagle scout, he volunteered every year to work with the homeless in NY.   He would converse with the men and brought a sewing kit to help sew clothes, backpacks and just make them feel good.

Matthew lost his insurance license, his career of 7 years and is now working the only job he could find- part time at Whole Foods working opening hours and closing hours, but managing to pay his bills to keep his home.

I appeal to you, as Matthew's mom, to look at his life, past, present and future when sentencing him.


Sincerely,


Anita B. Comiskey

To the Honorable Judge Rosenberg,

My name is Ashley Wiens and I am Matthew Comiskey's sister. I am aware that Matthew is pleading guilty to one count of making a threat on Twitter towards representative Lauren Boebert. While I do not excuse his behavior, I also understand that the stress and anxiety caused by the pandemic, economic turmoil, civil unrest and rioting as well as the inaccuracies of the constantly changing information flooding every news station is bringing out the worst in everyone and leaving many of us with psychological trauma that we are only just beginning to understand.

I have known Matthew my entire life, as he is my older brother by a year and one month. Matthew has not always had an easy life. He worked hard for each of his achievements and has frequently had to learn the hard way what not to do. However, he has always learned his lesson. Matthew was an eagle scout in our youth, where he learned about the outdoors and life skills. As children, Matthew would let me tag along on his scouting adventures and teach me about the different leaves, trees and insects we would encounter. When we would notice animal tracks on the ground, we would guess what animal it belonged to. I remember he would talk on and on about the history of a certain location or event and was always looking for more information about a topic to grow his knowledge and share it with others.

As Matthew grew older, his love for adventure and teaching others did not stop. Matthew metal detects in the early mornings, usually capturing great sunrise photos that he shares with me. Matthew has used his metal detecting skills to bring people together as well as to help those who have lost jewelry, usually a family heirloom or special gift. On more than one occasion, Matthew has shared with me how special those experiences are to him. It amazes me that he is able to find a treasure that someone believes is gone forever and somehow manages to get it returned to them. He is able to do it because being able to help people, and to be useful in their lives, is the driving force behind what brings Matthew pleasure and satisfaction in this world.

I believe this entire experience has been another hard learned lesson for Matthew. It has shown him that the repercussions of his lack of better judgment and childish behaviors can be life changing. Not only was Matthew faced with the initial financial hardship of paying an attorney twenty thousand dollars he did not have to be represented in this matter, but he also endures other permanent consequences. Matthew has lost his career in the insurance field (a career in which he has been working in all his life). My parents' home address being posted on the internet, along with the threats Matthew receives and fear for even using his name for possible future job interviews.

I understand that you will rule fairly in this matter. When doing so, I pray you will consider a sentence in which Matthew can receive the counseling support that he needs and can maintain some hope of having a future, being a better person and learning from his mistakes rather than one that would effectively ruin his life with a prison sentence or a court fee that is unattainable. I know that, if Matthew were to be sentenced to a lengthy term of community service, where he could continue to help those who need help, he will continue to strive to be a better person and benefit the lives of everyone around him.

Thank you for your time your honor in reading my character letter for my brother.  If you need to reach me to verify any information, I can be reached at 214.605.0931 or via email agc0033@yahoo.com

Respectfully,

*Ashley Wiens*
Ashley Wiens

To the Honorable Judge Rosenberg,

My name is Matthew Andren Cordaro and today I find myself today doing something that I never thought I would have to do: writing a letter to Your Honor for the consideration of my long time friend Matthew Lee Comiskey.

Due to our last names being so alphabetically close, I met Matt in the first 15 mins at a new school here on Long Island that I had transferred to. Matt made me feel accepted right away by showing me the ropes and introducing me to his friends.

Throughout the years that followed Matt has been another member of the family. My mother endearingly refers to him as "Matt-two". He was always there for my family to help with the big and the small things. Whenever I needed a ride to pick up my car from the auto repair shop, I would call Matt. Being a single parent, when my mom wanted to move something heavy, she would ask when Matt was going to come over so he could help.

For example, In the summer of 2003, my mom asked him to assist in remodeling our 40 year old driveway. We were without any power equipment, so it took us two whole days just to move and level the earth and another day to lay the seemingly infinite number of 50LB bags of rocks. The only thing he asked for in return was a beer.

In the summer of 2006, Dutch, my 10 year old dachshund that my mother gave to me as my first pet passed away. Matt was there to console me. He loved Dutch, too.

In 2017 he was there to take care of my mother's dog when she was in the hospital following surgical complications and I was unavailable. Later, when she was transferred to a nursing home, she needed clothing. Matt was kind enough to get them from her house for her.

On Feb. 1st 2020 I had to say goodbye to Matt. He was leaving early the next morning to be with his parents in West Delray Beach. We spent the evening reminiscing of our years together. We made plans together for the 2021 Daytona 500, and of course he insisted that I not pay for a hotel and stay at his place when in town. Finally, we passed on some of the last bits of wisdom we had to each other. When he walked out the door I was overtaken with emotion in the finality of it all. I felt like I was losing a brother. That was the last time I was able to see him in person due to the COVID shakeup that followed. Although COVID has held me back from heading south to see my friend, he made it a point to go have lunch with my Father and stepmother when they were vacationing in the area for their anniversary in 2021.

Matt has struggled with stability in his adult life. So for my whole family, receiving news of his successes was wonderful. What was catastrophic was our finding out what he had done. Of that, I was shocked and appalled and I personally condemn him as it was hurtful and harmful to all concerned, especially the victim. To realize that everything he's worked so hard for over the last number of years he destroyed in his brief, yet extreme lapse of judgment has been heartbreaking for our families. This especially rings true for me since, being been as much a

member of the Comiskey family as he has been an Andren/Cordaro, the realization of the collateral damage that has, and may yet still come, to his father and mother, Pat and Anita, by not having him around for help in their golden years and their soldiering of the financial burden that comes along with a felony conviction, is devastating. Furthermore, selfishly, losing a friend and a person I love and can rely on for advice and help is crushing.

It is my hope that those who have been hurt by his behavior can recover from their pain and suffering and that there are no long lasting effects. It is my hope that they may one day accept his apologies for his actions. And it is my hope that this letter has in some way expanded your view of the type of person that Matthew actually is.

Thank you for your time and for your consideration.

Sincerely,

Matthew Andren Cordaro